UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ELHANNON WHOLESALE NURSERY, INC.                    1:25-cv-522 (MAD/DJS)
and DONALD J. SUTTON,

                              Plaintiffs,          **COMPLAINT**

     v.                                                  **DEMAND FOR**
                                                    **JURY TRIAL**
SAINT-GOBAIN PERFORMANCE PLASTICS
CORPORATION, HONEYWELL INTERNATIONAL
INC. f/k/a ALLIED-SIGNAL INC. and/or
ALLIEDSIGNAL LAMINATE SYSTEMS, INC.,
EIDP, INC. f/k/a E.I. DUPONT DE NEMOURS AND
COMPANY, INC. and 3M COMPANY,

                            Defendants.
_____

Plaintiffs Elhannon Wholesale Nursery, Inc., and Donald J. Sutton, by their attorneys,

Dreyer Boyajian LLP, as and for a Complaint against defendants Saint-Gobain Performance

Plastics Corporation, Honeywell International Inc., f/k/a Allied-Signal Inc. and/or AlliedSignal

Laminate Systems, Inc., EIDP, Inc. f/k/a E.I. Dupont De Nemours and Company, and 3M

Company, allege the following upon information and belief:

## INTRODUCTION

1.      This is an action to recover damages and other relief as a result of the defendants'

PFAS contamination of plaintiffs' real property, soils, groundwater, aquifers, and tree nursery,

including monetary damages, clean up and removal costs, the costs of obtaining alternative water

supplies, declaratory and injunctive relief, and other losses.

2.      Plaintiff Elhannon Wholesale Nursery, Inc. ("EWN") is a local, family-owned and

operated tree nursery that is based out of the Town of Hoosick in New York State.

3.      Plaintiff ENW, is one of the largest wholesale nurseries in the Northeast, with nurseries on over 1,000 acres located along the Hoosic and Walloomsac Rivers.

4.      Plaintiff Donald J. Sutton is an owner of the real property that is the subject of this action and a principal of EWN.

5.      Specifically, this action concerns certain real property containing approximately 100 acres located in the Town of Hoosick that is owned and operated by plaintiffs as a tree nursery (further described below and referred to herein as the "Property").

6.      PFAS are human-made compounds that do not occur naturally in nature, are extremely persistent in the environment, both in water and soil, and are resistant to environmental degradation processes.

7.      Due to their longevity in the environment, PFAS are known as "Forever Chemicals."

8.      The PFAS family includes perfluorooctanoic acid (PFOA) and perfluorooctane sulfonic acid (PFOS).

9.      PFOA and PFOS are designated as hazardous substances under New York[1] and federal law as hazardous substances.[2]

10.     New York State has set regulatory limits for PFOA and PFOS in drinking water at 10 ng/L (parts per trillion or ppt); for PFOA and PSOS in groundwater at 6.7 ng/L and 2.7 ng/L,

---

[1] 6 N.Y.C.R.R. Section 597.3 List of Hazardous Substances, Table 1.

[2] 42 U.S.C. § 9602, CERCLA Section 102(a); 40 C.F.R. Part 302, Table 302.4; 89 Fed. Reg. 90, 39124, May 8, 2024.

respectively;[3] and PFOA and PFOS in agricultural soil at 0.66 ug/kg (parts per billion or ppb) and 0.88 ug/kg, respectively.[4]

11.    The EPA regulatory limit for PFOA and PSOS in drinking water is 4 ng/L.[5]

12.    The Property, including the soils, groundwater, aquifers, and nursery trees thereon, is contaminated by PFAS that was designed, manufactured, used, marketed, distributed, and/or sold by defendants.

13.    Plaintiffs' Property is located approximately 2,000 feet south of the Saint-Gobain Performance Plastics site located at 14 McCaffery Street in the Village of Hoosick Falls.

14.    The State of New York has declared the McCaffrey Street facility a state Superfund site and identified on-site disposal of contaminants at the facility as the source of PFAS contamination in the soils and groundwater beneath the facility, including the lower and upper aquifers.[6]

---

[3] NYSDEC 2023 Addendum to June 1998 Division of Water Technical and Operational Guidance Series (TOGS) No. 1.1.1., available at: https://extapps.dec.ny.gov/docs/water_pdf/togs111addendum2023.pdf.

[4] NYSDEC 2024 CP-51, available at https://dec.ny.gov/regulatory/regulations/remediation-guidance-and-policy-documents.

[5] EPA 2024 National Primary Drinking Water Regulation, available at: https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas.

[6] NYSDEC Region 4 – Environmental Remediation Project Information, Hoosick Falls Area, available at: https://dec.ny.gov/environmental-protection/site-cleanup/regional-remediation-project-information/region-4/hoosick-falls-area.

15.    Testing of groundwater beneath the McCaffery Street site indicated PFAS concentrations in exceedance of regulatory limits, including PFOA concentration in groundwater as high as 130,000 parts per trillion (ng/L)[7].

16.    Testing of soils at the McCaffery Street site indicate PFAS concentrations, including PFOA, in exceedance of regulatory limits.

17.    The State also determined that the McCaffrey Street site was the source of PFOA contamination of the Village of Hoosick Falls wellfield and drinking water supply, which is bounded by the 6.4 acre McCaffrey Street site and approximately 1,500 feet southeast of the facility's buildings.

18.    The State designated the Saint-Gobain facility, located at 14 McCaffrey Street, as a "significant threat to public health or the environment."

19.    The McCaffery Street site is also designated as a federal Superfund site.

20.    The State of New York has identified defendants Saint-Gobain Performance Plastics Corp. ("Saint-Gobain") and Allied Signal Inc. and/or AlliedSignal Laminate Systems, Inc., now doing business as Honeywell International Inc. ("Honeywell"), as two of the parties potentially responsible for the contamination of the groundwater in Hoosick Falls with PFOA.

21.    In 2021, the State issued a Record of Decision[8] for the McCaffery Street site that selected as a remedy for the Village of Hoosic Falls' municipal water supply, among other

---

[7] NYSDOH, Health Consultation, Saint-Gobain Plastics – McCaffery Street: Village of Hoosick Falls Public Water System (June 20, 2024), available at: https://www.atsdr.cdc.gov/HAC/pha/StGobain/St-Gobain-Hoosick-Falls-HC-508.pdf.

[8] NYSDEC Record of Decision, Saint-Gobain McCaffery Street Operable Unit Number 02: Municipal Water Supply State Superfund Project, Hoosick Falls, Rensselaer County, Site No. 442046 (December 2021), available at: https://extapps.dec.ny.gov/docs/remediation_hudson_pdf/saintgobainrod.pdf (hereinafter "2021 Record of Decision").

measures, the development of two new groundwater supply wells to be located south of the McCaffrey Street site.[9]

22.    Upon information and belief, the new wellfield to be developed for the Village's public water supply is situated approximately 1,000 feet south of plaintiffs' Property.

23.    In May 2024, plaintiffs learned that certain groundwater samples taken from test wells of the shallow and deep aquifers on plaintiffs' Property tested positive for PFAS, including PFOA, at levels that exceed regulatory limits for groundwater and drinking water.

24.    Upon information and belief, the soils on plaintiffs' Property are also contaminated with PFAS, including the nursery tree root balls that must be transplanted upon sale.

**PARTIES**

25.    Plaintiff Elhannon Wholesale Nursery Inc. ("EWN"), is a corporation duly organized and existing under the laws of the State of New York, having its principal place of business located at 20716 State Route 22, Petersburg, New York 12138.

26.    Plaintiff Donald J. Sutton is an individual residing in the County of Rensselaer, State of New York.

27.    Plaintiff Donald J. Sutton is an owner of certain lands situated in the Town of Hoosick Falls, County of Rensselaer, State of New York on State Route 22 (Tax Map No. 37.-2-37.12), consisting of approximately 100 acres (the "Property").

28.    Plaintiff Donald J. Sutton is also a principal of Elhannon Wholesale Nursery Inc.

29.    Plaintiff EWN leases the Property upon which it operates a nursery that grows various trees and other nursery stock for commercial sale.

---

[9] NYSEC 2021 Record of Decision at Figures 2 & 6.

30.     Defendant Saint-Gobain Performance Plastics Corporation ("Saint-Gobain") is a corporation organized under the laws of the State of California with its principal executive office located at 20 Moores Road, Malvern, Pennsylvania.

31.     Defendant Saint-Gobain is registered to do business as a foreign corporation in the State of New York.

32.     Upon information and belief, Saint-Gobain Performance Plastics Corporation is a wholly owned subsidiary of Compagnie de Saint-Gobaint, S.A., with its global headquarters located in Curbevoie, France.  Saint-Gobain is one of the oldest continuously operated companies in the world, with over 350 years of engineered materials expertise.  It is a Fortune Global 500 company, being one of the 100 largest industrial companies in the world with over € 46.6 billion in sales and 160,000 employees in 80 countries. Saint-Gobain Performance Plastics is the world's leading producer of engineered, high-performance polymer products.

33.     Defendant Honeywell International Inc. ("Honeywell"), formerly known as Allied-Signal Inc. and/or AlliedSignal Laminate Systems, Inc., is a Delaware corporation with its principal executive office located at 55 S. Mint Street, Charlotte, North Carolina.

34.     Honeywell is registered to do business as a foreign corporation in the State of New York.

35.     Honeywell is a Fortune 100 company with over $38.4 billion in sales and a global workforce of approximately 110,000, including 19,000 engineers and scientists. It serves a variety of industries, including the specialty chemicals industry.

36.     In 1999, Honeywell was acquired by Allied-Signal Inc. ("Allied-Signal"), who elected to retain the Honeywell name for its brand reputation.  Honeywell's headquarters was then

relocated to the AlliedSignal headquarters in Morristown, New Jersey. In 2021, Honeywell opened its new headquarters to Charolette, North Carolina.

37.     Allied-Signal was a leading aerospace, automotive, and engineering company that was created through the 1985 merger of Allied Corporation and Signal Companies. Together, these companies had operated in the United States since 1920s. Allied Corp. was formed out the consolidation of several chemical manufacturers, including the Barrett Company (founded 1903), General Chemical Company (founded 1899), National Aniline & Chemical Company (founded 1917), Semet-Solvay Company (founded 1894), and Solay Process Company (founded 1881). In the 1940s, these companies were transformed into divisions of Allied Chemical, later taking the name of Allied Corporation in 1981.

38.     At all relevant times, AlliedSignal Laminate Systems, Inc., was a wholly owned subsidiary and business unit of Allied-Signal. In 1999, Allied-Signal sold its Laminate Systems business.

39.     At all times relevant, defendants Saint-Gobain and Honeywell (through its predecessor Allied-Signal and/or AlliedSignal Laminates), operated the following property sites and facilities: 14 McCaffrey Street, Hoosick Falls, New York (the "McCaffery Street Site") (Tax Map No. 37.6-3-1), and 1 Liberty Street, Hoosick Falls, New York (the "Liberty Street Site") (Tax Map No. 27.10-9-20).[10]

40.     Defendant Honeywell (through its predecessor Allied-Signal and/or AlliedSignal Laminates) also operated the following property sites and facilities: John Street/3 Lyman Street in

---

[10] NYSDEC Order on Consent, Index No. CO 4-20160212-18 (June 3, 2016), available at: https://extapps.dec.ny.gov/docs/regions_pdf/stgobainco632016.pdf.

Hoosick Falls, New York (Tax Map No. 27.15-13-1); and River Road in Hoosick Falls, New York (Tax Map No. 37.-2-4, 37.-2.-2-5, 37.2-2-6).[11]

41.    Upon information and belief, defendant Honeywell (through its predecessor Allied-Signal) owned and operated the McCaffrey Street and Liberty Street sites from approximately 1986-1996.

42.    Upon information and belief, Saint-Gobain owned and operated the McCaffery Street and Liberty Street sites from approximately 1999 to the present.

43.    Defendant EIDP, Inc. f/k/a E.I. DuPont De Nemours and Company ("DuPont"), is a corporation organized under the laws of the State of Delaware with its principal executive office located at 974 Centre Rd., Wilmington, Delaware.

44.    DuPont is registered to do business as a foreign corporation in the State of New York.

45.    Prior to its merger and spinoff in 2015, DuPont was the largest chemical company in the world, originally founded in 1802.

46.    At all times relevant, DuPont designed, manufactured, used, marketed, distributed, and/or sold PFAS, including PFOA,[12] PFOS,[13] and/or polytetrafluoroethylene (PTFE) dispersions containing PFAS to defendants Saint-Gobain and Honeywell that were used at said defendants' facilities in their manufacturing processes as described herein.

---

[11] NYSDEC Order on Consent, Index No. CO 4-20160415-79 (June 3, 2016), available at: https://extapps.dec.ny.gov/docs/regions_pdf/oakmatorder.pdf.

[12] As used in this complaint, the term "PFOA" refers to both PFOA and its ammonium salt APFO.

[13] As used in this complaint, the term "PFOS" refers to both PFOS and the salts of its conjugate base perfluorooctanesulfonate.

47.    Defendant 3M Company ("3M") is a corporation organized under the laws of Minnesota with its principal executive office located at 3M Center, Bldg. 224-5N-40, Saint Paul, Minnesota.

48.    At all times relevant, defendant 3M designed, manufactured, used, marketed, distributed and/or sold PFAS to defendants Saint-Gobain and Honeywell that was used at these defendants' facilities in their manufacturing processes as described herein.

49.    At all relevant times, defendant 3M designed, manufactured, marketed, used, distributed and/or sold PFAS, including PFOA and PFOS, to DuPont and other manufacturers for inclusion in polytetrafluoroethylene (PTFE) and fluorinated ethylene propylene (FEP)[14] dispersion products at least through 2000, and some of these PTFE and FEP dispersions were sold to defendants Saint-Gobain and Honeywell and used at these defendants' facilities in their manufacturing processes as described herein.

50.    At all relevant times, defendant DuPont designed, manufactured, used, marketed, distributed and/or sold fluoropolymer materials containing PFAS after 2000 to other manufacturers for inclusion in PTFE dispersion products up through 2015 and these PTFE dispersion products were sold to defendants Saint-Gobain and Honeywell and used at these defendants' facilities in their manufacturing processes as described herein.

51.    At all relevant times, defendant DuPont also designed, manufactured, used, marketed, distributed and/or sold fluoropolymer materials containing PFAS directly to defendant Saint-Gobain between 2000-2015.

---

[14] References to PTFE dispersions are intended to also include FEP dispersions and other PFOA and PFOS-containing products manufactured by defendants DuPont and 3M.

## JURISDICTION AND VENUE

52.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) based on diversity of citizenship among the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

53.     Personal jurisdiction exists over the Defendants pursuant to the long-arm statute of the judicial district where the cause of action arose and plaintiffs reside, i.e., New York State C.P.L.R. § 302(a), because at all relevant times, Defendants, among other things, transacted regular and substantial business within New York State; contracted to supply goods and services within said state; the events or claims giving rise to this Complaint arose within said state; and/or Defendants committed a tortious act outside said state causing injury to person or property within the state.

54.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the complaint occurred in this district.

## FACTUAL ALLEGATIONS

55.     Plaintiffs repeat and reallege each paragraph above as if set forth fully herein.

### A. PFAS Background.

56.     PFAS are a group of fluorinated chemicals called per- and polyfluoroalkyl substances.

57.     Perfluorinated chemicals have carbon chain atoms that are completely fluorinated (i.e., each carbon atom is bonded to a fluorine atom), whereas polyfluorinated chemicals have at least one carbon atom chain that is not fully fluorinated.

58.     PFAS includes PFOA (perfluorooctanoic acid) and PFOS (perfluorooctane sulfonic acid).

10

59.    PFOA and PFOS have a perfluorooctanyl chemical structure, which means they have an eight-unit carbon chain that is completely fluorinated (also known as "C8" chemicals).

60.    APFO, or ammonium perfluorooctanoate, is the ammonium salt of PFOA.

61.    Common salts of PFOS include the ammonium, diethanolamine, potassium, and lithium forms.

62.    All PFAS, including PFOA and PFOS, are human-made chemicals that are not found in nature.

63.    PFOA and PFOS are designated as hazardous substances by EPA and NYSDEC.

64.    PFAS were utilized as polymerization aids and as a dispersion and wetting agents in the manufacture of fluoropolymers.

65.    Fluoropolymers are a type of polymer material that have useful properties, including tolerance to high temperatures, resistance to a wide range of harsh chemical environments, ability to repel both water and oily substances, low dielectric constants, and low coefficients of friction.

66.    One type of fluoropolymer is PTFE (polytetrafluoroethylene), which can be produced in different forms, including dispersion PTFE (also known as "aqueous fluoropolymer dispersion" or "AFD").

67.    PFAS, including PFOA and PFOS, were used in manufacturing processes to make products resistant to stains, grease, soil, water and heat, including fabrics, non-stick cookware, food packaging, clothing, carpets, upholstered furniture, leather products, cosmetics, lubricants, paints, polishes and adhesives.

68.    In their raw form, PFOA and PFOS appear as a white powdery substance at room temperature.

69.     PFOA and PFOS are water soluble.

70.     Defendant 3M was the largest manufacturer of PFOA and PFOS in the United States from the 1940s through the early 2000s.

71.     3M manufactured PFOA and PFOS and sold products containing these chemicals.

72.     Defendant 3M was the only known manufacturer of PFOS and PFOS-precursor products in the United States.

73.     For example, 3M used PFOS to manufacture and sell products under the brand name Scotchgard™.

74.     In 2000, defendant 3M began to phase out production of PFOA and PFOS.

75.     In the early 1950s, defendant DuPont began using PFAS in dispersion polymerization in the manufacture of fluoropolymers.

76.     For example, DuPont used PFOA to manufacture and sell products under the brand name Teflon™.

77.     Defendant DuPont manufactured, purchased, used and for a brief period, manufactured PFOA as a processing aid in the production of fluoropolymers.

78.     Defendant DuPont began manufacturing PFOA after 3M chose to stop making and selling the chemical in 2002, and DuPont then continued to manufacture PFOA and use it in its manufacturing processes after 2002.

79.     Defendant DuPont also sold PFOA to other manufacturers of PTFE and FEP dispersions once it took over manufacturing the chemical from 3M after 2000.

80.     In 2006, DuPont announced its intention began to phase out the manufacture, purchase or use of PFOA and PFOS by 2015.

81.     Upon information and belief, defendants 3M and DuPont have attested to the United States Environmental Protection Agency that they have phased out PFOA and PFOS, and chemicals that degrade to PFOA and PFOS, from emissions and products by the end of 2015.

82.     Due to their chemical structure, PFAS are stable chemicals that are resistant to thermal, chemical and biological degradation, and are extremely persistent in the environment.

83.     During manufacturing processes and through the use and disposal of PFAS-containing products, PFAS can be released into the air, water and soil.

84.     PFAS are highly mobile in air, water and soil, and once they are released into the environment, they can migrate through surface water, groundwater, soil and air.

85.     PFAS, including PFOA and PFOS, are persistent in water and soil, and because they are water-soluble, they can migrate readily from soil to groundwater.

86.     PFAS are readily absorbed into plant and animal biota and have a tendency to accumulate with repeated exposure.

87.     Human epidemiological studies have found associations between PFAS exposure and certain adverse health effects and disease.

88.     PFOA and PFOS are classified as probable human carcinogens by the International Agency for Research on Cancer (IARC).

89.     The United States Environmental Protection Agency (EPA) has concluded that PFOA and PFOS are likely to be carcinogenic to humans via the oral route of exposure.[15]

---

[15] EPA Fact Sheet (January 2025), Human Health Toxicity Assessment for Perfluorooctanoic Acid (PFOA) [EPA Doc. No. 822F25001], available at: https://www.epa.gov/system/files/documents/2025-01/pfoa-human-health-toxicity-assessment-infographic-factsheet.pdf; EPA Fact Sheet (January 2025), Human Health Toxicity Assessment for Perfluorooctane Sulfonic Acid (PFOS) [EPA Doc. No. 822F25002], available at: https://www.epa.gov/system/files/documents/2025-01/pfos-human-health-toxicity-assessment-infographic-factsheet.pdf.

A. **The Manufacturing Defendants' Knowledge of PFAS Human Health Risks.**

90.    For decades, defendants 3M and DuPont knew that PFAS materials, including PFOA and PFOS, were toxic and would adversely affect the environment and human health.

91.    By the 1950s, defendant 3M knew that PFAS were harmful to humans and the environment.

92.    As early as 1950, defendant 3M began testing the physiological and toxicological properties of PFAS compounds.

93.    In 1950, defendant 3M documented that PFAS (i.e., perfluorobutyric acid) accumulates in the blood of mice under laboratory exposure to the chemical.

94.    Defendant DuPont had received inquiries regarding the toxicity of PFOA as early as 1954 and began to be concerned about its toxicity.

95.    By 1956, a Stanford University study showed that PFOA binds to proteins in human blood and bioaccumulates.

96.    In or about 1961, toxicologists working for defendant DuPont concluded that PFOA and other 'Teflon' dispersing agents were toxic. DuPont's toxicology section chief stated the chemical should be "handled with extreme care" and that contact with skin should be "strictly avoided."

97.    By 1962, DuPont researchers concluded that exposure to PFOA causes an increase in the size of the livers in rats, rabbits and dogs.  DuPont was also aware that "[c]umulative liver, kidney and pancreatic changes can be induced in young rats by relatively low does of $C_8APFC$."

98.    In 1964, a group of Old DuPont employees working in Teflon™ manufacturing became sick after their department was moved to a more enclosed workspace. They experienced chills, fever, difficulty breathing, and a tightness in the chest – symptoms referred to variously as

"polymer-fume fever," "Teflon flu," or simply, "the shakes." Polymer-fume fever was first reported in medical literature in 1951.

99.     In 1965, defendant DuPont sponsored a study where rats were fed a PFAS compound over a ninety-day period. Necropsies revealed discoloration of the liver, increased liver and kidney weight, and increased spleen size.

100.     In 1970, defendant DuPont became aware that a large group of company foremen and salesmen at its Washington Works facility in West Virginia where Teflon™ manufacturing took place, had higher incidence rates of myocardial infarction, cerebrovascular disease, diabetes mellitus and cancer than its high-level executives at the facility who were not involved directly in manufacturing operations.

101.     In 1970, an internal Dupont memo stated that defendant DuPont's internal laboratory had found PFOA to be "highly toxic when inhaled and moderately toxic when injected."

102.     In 1975, defendant 3M learned there was a "universal presence" of PFAS in human blood samples taken from across the United States. After reporting organic fluorine compounds in blood bank samples taken from around the United States at levels corresponding to approximately forty-five ppb, one of the researchers who made this discovery contacted the company to see if it knew of "possible sources" of the chemicals, inquiring about consumer products like Teflon™ and Scotchgard™.  3M's scientists concluded internally that the fluorine compounds resembled 3M's own PFOS, but "plead ignorance" to the researcher, misled him by "advis[ing] him that 'Scotchgard' was a polymeric material not a [fluorochemical]," and did not share this information outside the company.

103.    By 1976, defendant DuPont knew about research showing detections of organic fluorine in blood bank samples in the United States, which the researchers believed could be a potential result of human exposure to PFAS.

104.    In 1976, defendant 3M began monitoring the blood of its employees for the presence of PFAS because the company was concerned about potential health effects.  For example, workers at 3M's Chemolite plant in Cottage Grove, Minnesota, were found in June 1976 to have organic fluorine compounds in their blood at levels "1,000 times normal."

105.    By 1978, defendant 3M had found elevated organic fluorine levels in the blood of its workers exposed to fluorinated surfactants.

106.    When Defendant DuPont learned of these elevated levels in 3M workers, it too began an internal review to determine its workers' PFAS concentrations and documented high concentrations of these chemicals in the blood of its factory workers at its Washington Works plant in West Virginia, showing that PFAS bioaccumulates and is not easily removed from the body.

107.    During the late 1970s, defendant 3M's and DuPont's internal studies continued to demonstrate the environmental persistence and severe toxicity of the company's chemicals.

108.    In 1978, a 3M study warned that PFAS "are likely to persist in the environment for extended periods" and that they were "shown to be completely resistant to biodegradation."

109.    In 1978, defendant DuPont's Corporate Medical Director, Bruce Karrh, M.D., published an article in a professional journal stating: "It is the duty of every company's management to discover and reveal the unvarnished facts about health hazards. . . [A] company should disclose health-hazard information.  It should be candid, and lay all the facts on the table. This is the only responsible and ethical way to go. This approach is the correct one, of course and it is the way we try to proceed at DuPont."

110.    By September of 1978 defendant DuPont had reviewed medical records of 11 operators and 18 laboratory workers with long-term exposure to PFOA and found that more of them than anticipated had abnormal liver function tests (elevated liver enzymes in their blood serum).

111.    In the late 1970s, defendant 3M consulted with Dr. Harold C. Hodge of the University of Rochester.  At a meeting in 1978, Dr. Hodge told 3M's Medical Director, Dr. F.A. Ubel, that physical examination results of employees should be compared with controls.  "There appears to be indications of liver change from the physical examination results.  In terms of indicators of liver disorder, there are [sic] a higher percentage of Chemolite [one 3M facility] than at Decatur [another 3M facility] and the organically bound fluorine level at Chemolite is correspondingly higher."  Dr. Hodge indicated to 3M at this time that a potential hazard was present regarding organofluorine chemical exposure to its workers.

112.    In 1979, an internal 3M report discussing the studies on PFAS toxicity to animals stated that the compounds were "more toxic than anticipated" and recommended that "lifetime rodent studies should be undertaken as soon as possible."

113.    In 1979, a defendant 3M study reported that one of 3M's fluorosurfactants was found to be completely resistant to biological test conditions and that it appeared waterways were the "environmental sink" for the fluorosurfactants.

114.    With mounting evidence that its PFAS were toxic, persistent, and mobile in the environment, concerns were growing internally at 3M and DuPont about the possible risks to its employees.

115.    A 1979 memo from an employee in 3M's medical department concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects

for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure." That same year, an outside researcher recommended additional testing and told 3M that reducing employees' exposure to PFAS "should have top priority."

116.    By 1979, defendants DuPont and 3M were sharing research on the effects of PFAS to determine the risk to their employees.

117.    A joint meeting was held in 1979 between defendant 3M's fluorochemical exposure committee and defendant DuPont's Eugene Berman and several of his DuPont colleagues. Both companies' representatives agreed that since there were no *established* adverse health effects associated with the findings of accumulated fluorochemicals in the blood of workers at the two companies there was no reason to provide an 8E notification under TSCA to the Environmental Protection Agency regarding these findings. Minutes from the meeting indicate that a discussion transpired between the two companies as to whether they would make any efforts to seek evidence of a possible association between worker blood levels and illness: "DuPont was asked if they had carried out any chronic studies on fluorochemicals in the past and if they planned any in the future. In both cases the answer was negative. Fluorochemicals have a low priority in their chronic testing program. They would not carry out such studies unless they were forced to by regulations."

118.    In 1979, defendant DuPont learned that PFOA caused metabolic abnormalities, including uncoupling of oxidative phosphorylation in rat liver mitochondria that were oxidizing succinate. It also learned that PFOA seemed to alter the immunochemical reaction of bovine (cow) serum albumin. It also was aware at that time that: 1) PFOA caused liver enlargement in rats and death at high doses; 2) increases in plasma enzyme levels indicative of cellular damage in dogs and death at high doses; and; 3) inhaled doses in rats for only four hours could cause liver enlargement and corneal opacity.

119.    Based upon the adverse health effects of PFOA on laboratory animals, in 1979 defendant DuPont established a provisional PFOA acceptable exposure level for its employees of 0.01 mg/m$^3$ in air based upon an 8-hour time-weighted average exposure.

120.    In 1979, defendant DuPont found increased PFOA levels in the blood of eight workers who worked in the FEP polymerization and TFE dispersion polymerization processes, with the average blood level for PFOA among the eight workers being 8.2 ppm (8,200 ppb).

121.    In 1979, defendant DuPont was aware that blood test results of its Washington Works employees from 1978 showed that organic fluoride levels were associated with increases in SGOT levels in blood serum.  SGOT (now more commonly referred to as AST) is a liver enzyme which when found at increased levels in blood serum is a sign of possible liver damage.

122.    Defendant DuPont was also aware in 1979 that "compound-related effects" (effects related to PFOA) were observed in both Rhesus monkeys and Charles River CD rats, but that "monkeys were more severely affected of the two."  It learned that "the data on monkeys suggested increased incidences of chronic interstitial nephritis [kidney damage], hyperkeratosis in the skin and a slight increase in skeletal muscle atrophy … Similarly, the data on rats suggest hepatocellular necrosis [liver damage], sinusoidal liver congestion and the presence of yellow-brown pigment in the epithelium of the convoluted tubules of the kidney."

123.    By 1979, defendant DuPont was aware that a 90-day oral study in Rhesus monkeys had been administered at dosage levels of 0, 3, 10, 30 and 100 mg/kg/day of PFOA, with the monkeys receiving the highest dose dying during weeks 2-5 of the study, three of the monkeys receiving the 30 mg/kg/day dose also died during weeks 7-12 of the study while all monkeys exposed at this dose showed signs of toxicity in the gastrointestinal tract and other adverse changes. Monkeys dosed at the two highest levels also showed weight loss from the first week of the study.

124.    By 1979, defendant DuPont had data indicating that, not only was organic fluorine/PFAS building up in the blood of its exposed workers, but those workers exposed to PFAS had a significantly higher incidence of health issues than did unexposed workers.

125.    In 1980, defendant DuPont internally confirmed, but did not make public, that PFOA "is toxic," that "people accumulate C-8" in their tissues, and that "continued exposure is not tolerable."

126.    By the 1980s, defendant DuPont not only knew that PFAS accumulated in humans, but it was also aware that PFAS could cross the placenta from an exposed woman to her fetus. DuPont concealed its knowledge of the connection between PFAS and birth defects and chose to mislead its employees about the risks they faced.

127.    Defendant 3M commissioned early PFOA toxicology studies that were summarized in 1980, and the liver was highlighted as a target organ, while effects on the immune system were also reported.  The study reports were not submitted to the EPA until 2000, the year defendant 3M decided to stop manufacturing PFOA, but most, if not all, were shared with Defendant DuPont years earlier.

128.    In 1980, PFOA animal toxicity studies were published by Griffith and Long in the JAIHA.

129.    By 1980, defendant DuPont had internally confirmed that PFOA "is toxic," "people accumulate" the chemical in their bodies after exposure and "continued exposure is not tolerable." At this same time Defendant DuPont documented that sixteen of its workers had PFOA blood serum levels of between 4.97 ppm and 21.69 ppm (4,970 ppb and 21,690 ppb).

130.    In 1980, defendant DuPont was aware that the rate of first time myocardial infarctions (heart attacks) in company foreman at its Washington Works facility was almost double what would have been expected.

131.    In materials from a C-8 Communications meeting, dated July 31, 1980, D.E. Steiner, an employee of defendant DuPont, stated: "After 25 years of handling C-8, we see no damage among workers. However the potential is there – C-8 has accumulated in the blood. Because of this accumulation we have decided to undertake programs to minimize accumulation of C-8 in the blood in the workers."

132.    By 1981, defendant 3M was aware that PFOA ingestion caused birth defects in the eye lens of rats. Defendant 3M then moved twenty-five female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure."

133.    In March of 1981, defendant 3M informed defendant DuPont of the rat study. Acting on this information, defendant DuPont surveyed children born to workers of its Teflon Division and found birth defects in two of seven children born to PFOA exposed workers, both of whom had eye defects. Defendant DuPont then removed all female employees from PFOA exposed jobs, but did not inform them of the reason for their transfer.

134.    By 1981, defendant DuPont was aware that PFOA in the blood serum of a pregnant woman could cross the placenta to the fetus. In 1981, defendant DuPont began secretly monitoring female employees who had been exposed to PFOA and conducted blood sampling of those who were pregnant or recently pregnant. Of the eight women who gave birth during this time period, two of the eight gave birth to children with birth defects in their eyes or face, and a third child had PFOA in the umbilical cord. As DuPont's medical director Bruce Karrh explained in a memo, this monitoring was undertaken to "answer a single question – does [PFOA] cause abnormal children?"

The results of the research were described as "statistically significant." DuPont abandoned the study without informing regulators or employees.

135.    Defendant DuPont's observations in pregnancy monitoring were consistent with 3M's rat study, and in March 1981 DuPont had a pathologist and a birth defects expert review the 3M study.  They  concluded that "the study was valid" and that "the observed fetal eye defects were due to [PFOA]."

136.    Later in 1981, Old DuPont informed their employees "based on our review of the results of the further studies, it does not seem that the observed effects on the eyes of the unborn rats were due to [PFOA]."

137.    Defendant DuPont reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but DuPont concealed its data confirming the transplacental movement of PFOA in humans.

138.    In 1982, Old DuPont's medical director warned in a confidential memo about employees being exposed to potentially dangerous levels of PFOA. He recommended that "available practical steps be taken to reduce this exposure."

139.    By the early 1980's, defendant DuPont and 3M were sharing their internal studies concerning health and environmental effects associated with exposure to PFAS that the companies were not sharing publicly.

140.    In 1982, Defendant DuPont calculated that approximately 40 percent of the PFOA vapor inhaled was retained in the blood of human males.

141.    A cross-sectional study of worker health at 3M's Chemolite plant in Cottage Grove, Minnesota was summarized by a 3M medical officer in 1982 as showing a high prevalence of high blood pressure and elevation of cholesterol.  No apparent effort was made to compare the incidence

of these conditions to PFOA or PFOS blood levels and the authors concluded that this observation was caused by worker lifestyle, not occupational exposures.

142.    On November 23, 1982, defendant DuPont's Medical Director, Bruce Karrh, MD, wrote in an internal memorandum stating: a) "Our knowledge of the product health effects of long-term exposure to low levels of C-8 is quite limited"; b) "C-8 is retained in the blood for a long time, creating concern in other areas such as blood donations, etc."; and c) "All employees, not just Teflon area workers, are exposed."

143.    In 1983, defendant 3M Environmental Laboratory scientists advocated for funding to perform an ecological risk assessment of fluorochemicals and argued that concerns about PFAS give rise to "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment." No testing was authorized in response to the proposed plan.

144.    By September of 1984, defendant 3M's medical service team noticed an increasing trend in worker organic fluorine concentrations in blood testing that had begun eight years earlier. The team advised "we must view this present trend with serious concern . . . exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

145.    Thereafter, defendant 3M endeavored to search to for any blood samples among its workers that were free of organofluorine compounds. When this was unsuccessful, an internal 3M document proposed: "It is in the interest of 3M to strengthen the evidence of non-industrial sources of organic fluorine in normal human blood." 3M initiated efforts beginning in 1993 to show that organic fluorine in blood could be from entirely natural sources, but was unable to find any data to support this hypothesis.

146.    By June 14, 1984, defendant DuPont was aware from analysis of blood testing of former Teflon Division employees that the average biological half-life of PFOA in human blood was approximately 2.4 years, but with considerable variability between individuals.

147.    In 1984, defendant DuPont was aware that male operators in the Teflon Division that had worked there for many years had complained about difficulty in achieving pregnancy with their wives.

148.    By 1986, defendant DuPont was aware of a cancer morbidity study among its Washington Works employees that showed male hourly wage workers had an incidence of bladder cancer deaths at more than double what would have been expected.

149.    By 1987, defendant DuPont was aware through a study conducted of its Chamber Works plant in Deepwater, New Jersey, where fluorochemicals were used, that there were increases above expected rates of death from female breast cancer, bladder cancer, Hodgkin's disease, lung cancer, urinary cancers in men and cirrhosis of the liver in women.

150.    On June 12, 1987, H.A. Smith, of the Safety, Energy & Environmental Affairs office of defendant DuPont's Manufacturing Division made a request to DuPont's Haskell Laboratory that they establish an acceptable level of PFOA in the blood and an acceptable level of PFOA in drinking water .

151.    By 1988, defendant DuPont was aware that PFOA was associated with increased rates of carcinogenicity in rats, including testicular cancer.

152.    In 1988, defendant DuPont began treating PFOA internally as a possible human carcinogen.

153.    On March 9, 1988, defendant DuPont first recommended a community exposure guideline ("CEG") for drinking water for PFOA of 1 ug/L (ppb).  This guideline was adopted by

DuPont in June of 1991 and was intended to be protective for community consumption of PFOA contaminated drinking water. DuPont never advised its customers of its PFOA-containing AFD products that it had established a CEG for PFOA in drinking water.

154. In 1989, a study by defendant DuPont of cancer incidence among its Washington Works employees, DuPont detected an increased incidence of leukemia, buccal cavity and pharynx cancer, kidney and other urinary cancers, including bladder cancer and multiple myeloma.

155. By 1989, defendant DuPont was aware that there were increases in other cancers at its Chamber Works facility as well, including pancreatic, lung, kidney and bladder cancers and Hodgkin's disease.

156. An internal DuPont memo dated December 14, 1989, entitled "Washington Works: Cancer Incidence and Overall Mortality Rates" indicates that among Washington Works employees there was an increased incidence over expected of testicular cancer, kidney cancer and other urinary cancers.

157. In 1989, a review of mortality data among defendant 3M's chemical division workers found, compared to Minnesota death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

158. By 1990, defendant DuPont was aware that among its Chamber Works employees there was a statistically significant excess of deaths due to urinary cancers, a statistically significant increased incidence of bladder cancer in male employees, a statistically significant increase in mortality from cancer of the digestive organs among female employees and female employees continued to have a statistically significant elevation in the incidence of cirrhosis of the liver.

159. A 1990 DuPont internal industrial hygiene data review demonstrated a correlation between PFOA levels in the air and PFOA blood levels in workers who inhaled contaminated air.

It was found that levels in blood were an order of magnitude or more higher than the levels in the air, which demonstrated that PFOA bioaccumulated inside the human body.

160.    In a DuPont report dated April 12, 1990 entitled "Investigation of Hormonal Mechanisms for C-8 Induced Leydig Cell Adenoma" by Mark Hurtt and Jon Cook of DuPont's Haskell Laboratory, which reviewed data derived from a 3M animal study, the authors concluded that the induction of Leydig cell adenoma (testicular tumors) related to PFOA exposure was likely to be hormonally mediated.

161.    By October of 1990, defendant DuPont learned that PFOA induced a dose-related decrease in serum testosterone, which appeared to document a direct effect of PFOA on the testes.

162.    On March 15, 1991, Wayne H. Martin of defendant DuPont's regulatory affairs department sent a memo that reported on a meeting at which he and other DuPont employees decided that "A warning of potential C-8 hazards (especially from condensate) should be included in MSDSs for all products in which C-8 concentration is 0.1% or more." It also indicated that all other "product literature which contains safety or health warnings should be revised to be consistent with MSDS."

163.    In October of 1991, an internal proposal to conduct a cross-sectional study of liver enzyme levels among Washington Works employees with potential exposure to PFOA was rejected by defendant DuPont's management. In notes from a meeting when this proposed study was considered, a DuPont employee wrote: "Do the study after we are sued."

164.    In the unpublished 1992 thesis of Frank Gilliland, MD who studied the clinical pathology parameters of 111 male workers at defendant 3M's Chemolite plant in Cottage Grove, MN, Dr. Gilliland found a positive correlation between PFOA exposure measured as serum total organic fluorine and estradiol (an adverse effect) and a negative correlation with free testosterone

(also an adverse effect) with this association being stronger in older men. Dr. Gilliland concluded that PFOA may affect male reproductive hormones.

165.    Dr. Gilliland's 1992 unpublished thesis from his 3M worker study also showed thyroid effects in 3M production workers that were associated with organofluorine concentrations in worker blood serum. A positive correlation was seen between organic fluorine and the thyroid stimulating hormone in serum, a sign of thyroid deficiency.

166.    An internal document from defendant DuPont acknowledged that at doses of 300 ppm PFOA caused statistically significant increases in adenomas and carcinoma of the liver, pancreas and Leydig cell adenomas in the testis. Thus, by 1993, DuPont was aware of two animal studies that found that PFOA caused testicular cancer and DuPont knew that PFOA caused cancer at three different anatomical sites among laboratory animals exposed to PFOA.

167.    By 1993, defendant 3M began to monitor PFOA levels in the blood serum of its production workers and conducted a mortality study of such workers showing a 3-fold excess occurrence of prostate cancer in workers employed more than ten years.

168.    When 3M discussed DuPont's results on cancer in male rats with colleagues from the UK company ICI in 1995, the latter strongly espoused that APFO should be considered an animal carcinogen, as the benign tumors observed are simply early lesions that ultimately lead to malignant tumors, but 3M representatives disagreed.

169.    By 1996 Defendant DuPont was informed that testing linked PFOA to damage to DNA.

170.    In or about 1996, defendant DuPont together with 3M and several other manufacturers of APFO containing products, funded a study to assess the effects of PFOA on humans by exposing monkeys to the chemical. This study was commissioned through the APME

organization, an industry trade association for plastics manufacturers active in Europe. By November of 1998, defendant DuPont became aware that monkeys in this study were suffering from severe health effects. By 1999 even the monkeys receiving the lowest dose of PFOA were suffering adverse health effects, including liver toxicity, and it was determined that there was no exposure level at which no observable effects could be found (NOEL) in non-human primates.

171.    As of January of 1997, researchers at defendant DuPont were aware of a hormonally-mediated mechanism for the Leydig cell tumors in rat testes. In a document entitled "Hazard Characterization for Human Health in C8 Exposures, CAS Registry No. 3825-26-1," Lisa B. Biegel, Ph.D., Senior Research toxicologist at the DuPont Haskell Laboratory wrote: "The studies summarized below support a hormonally-mediated mechanism for the Leydig cell tumorigenesis: C8 produces an increase in hepatic aromatase activity, which elevates serum estradiol concentrations, which in turn modulates growth factors in the testes, which results in tumor formation…. The mechanism of tumorigenesis is not completely understood, and therefore relevance to humans cannot be completely ruled out. However, it is known that non-genotoxic compounds (such as C8) produce Leydig cell tumors by altering the endocrine system."

172.    A paper published in 1997 by John C. Cook of Defendant DuPont together with Eric D. Clegg, concluded: "Occurrence of Leydig cell adenomas in test species is of potential concern as both a carcinogenic and reproductive effect if this mode of induction and potential exposure cannot be ruled out as relevant for humans [and]… it should be assumed that humans are potentially susceptible."

173.    In April of 2000, defendant DuPont rejected its occupational health official's recommendation for a comprehensive medical surveillance program for employees exposed to

PFOA, noting that establishing such a program "could have significant repercussions at any of our other sites that handle . . . similar products."

174.    In early 2000, the United States Environmental Protection Agency notified defendant 3M that it intended to pursue more rigorous regulation of the perfluorinated chemicals that 3M manufactured.  In May of 2000, 3M publicly announced that it was voluntarily withdrawing from the perfluorinated chemical market, including its manufacturing of APFO.  Two of the reasons for 3M's decision were PFOA's bio-persistence and toxicity.

175.    In October of 2001, Paul M. Hinderliter, Ph.D. and Gary W. Jepson, Ph.D. of the DuPont Haskell Laboratory, drafted a paper entitled: A Simple, Conservative Compartmental Model to Relate Ammonium Perfluorooctanoate (APFO) Exposure to Estimates of Perfluorooctanoate (PFO) Blood Levels in Humans."  The paper described calculations which showed that ingestion of 1 part per billion of PFOA in drinking water corresponded to human PFOA blood levels 300 times higher.

176.    In March of 2002, a defendant DuPont website titled "C-8 INFORM" continued to state that PFOA had no adverse health effects: "In more than 50 years of C-8 use by DuPont and others, there have been no known adverse human health effects associated with the chemical.  3M and DuPont studies, as well as extensive other scientific data, support the position of no known adverse human health effects associated with C-8."

177.    In 2003, defendant 3M conducted a mortality study of its workers exposed to PFOS, and reported excess bladder cancer incidence with high exposure jobs. A mortality registry kept by defendant DuPont demonstrated an excess of kidney cancer deaths over expected levels for workers at the Washington Works plant.

178.    Notwithstanding its internal knowledge of PFAS health and environmental risks from as early as the 1950s, defendant DuPont publicly stated in 2003 that "[w]e are confident that there are no health effects associated with [PFOA] exposure," and that "[PFOA] is not a human health issue."

179.    Defendant DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. An ERB member called such statements "[s]omewhere between misleading and disingenuous." For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

180.    In October 2006, contrary to ERB's advice, DuPont's chief medical officer issued a press release stating that "there are no health effects known to be caused by PFOA." An ERB member criticized the press release because it "appear[ed] written to leave the impression 'don't worry.'"

181.    In 2009, defendant 3M performed a follow-up study of its workers exposed to PFOA which showed an increase in prostate cancer incidence in workers with moderate to high exposures.

**B.  The Manufacturing Defendants' Knowledge of PFAS Environmental Harm.**

182.    By the early 1960s, defendants 3M and DuPont knew about the environmental risks associated with the manufacturing, use and disposal of fluorochemicals such as PFOA and PFOS.

183.    Defendants DuPont and 3M shared information about the environmental contamination potential of PFAS, and the information alleged to be known by one was made

known to the other.

184.    By 1960, defendant 3M knew that its perfluorochemical waste could leach into groundwater and otherwise enter the environment. An internal 3M memorandum from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells." Later that year, 3M confirmed that perfluorochemicals had already polluted the wells.

185.    By the mid-1960s, defendant 3M already considered PFAS to be "toxic" and persistent and it understood the propensity of these chemicals to spread and pollute the environment. 3M chose to withhold its knowledge from its customers and the public, even as its knowledge of the dangers of PFAS continued to grow.

186.    As early as 1963, defendant 3M knew that its PFAS were highly stable in the environment and did not degrade after disposal. A June 15, 1963 technical manual prepared by 3M's Chemical Division described its PFAS fluorochemical surfactants as being stable in the environment and "[s]ome are completely resistant to biological attack." The same report also confirmed that 3M knew the chemicals to be "toxic."

187.    In 1966, defendant DuPont became aware that perfluorochemicals (PFCs) move rapidly in groundwater and migrate into nearby bodies of water.

188.    By 1966, defendant DuPont knew that perfluorochemicals in groundwater move rapidly into other nearby bodies of water.

189.    By August 31, 1966 defendant DuPont became aware that, without pretreatment, a small amount of perfluorocarboxylic acid (the class of pefluorochemicals to which PFOA and PFOS belongs) dispersing agent, deposited in a landfill "would be leached into the groundwater."

190.    In 1970, defendant 3M researchers had documented that its "Light Water" perfluorochemical used in firefighting foam was "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution." In 1972, the toxicity of 3M's Ligh Water on other fish and marine life further confirmed the toxicity of PFAS.

191.    By the 1970s, defendants DuPont and 3M were concerned about the risks posed to the general population from exposure to their fluorochemicals.

192.    By May 13, 1975, defendant DuPont employees in a memo entitled "Investigation of Current Teflon® Waste Disposal" stated: "The problems with disposing of 'Teflon' waste are fear of toxicity, either from 'Teflon' itself or additives in some products.  Although fears of contamination of underground water supplies by 'Teflon' scrap may be exaggerated, the possibility of small amounts of undesirable materials such as 'Triton'® and C-8 being present does exist.  For this reason, we have elected to not landfill 'Teflon' waste at the local landfill, where large quantities of underground water serving both the Plant and the surrounding area are present."

193.    In a December 6, 1975 meeting, Dupont and 3M discussed the toxicity of PFOA, and a Dupont representative "emphasized that duPont is not advocating the use of Teflon K in food applicators and actually recommends against such use." Dupont and 3M, however, did not inform the public or regulators about such concerns, and their PFOA products continued to be used for decades, including for use in food-related products.

194.    In 1982, defendant DuPont knew that PFOA from its Washington Works facility was contaminating the Ohio River and could be present in drinking water that came from the Ohio River.  An internal DuPont memo dated October 19, 1982 cited analysis and projections of estimated human PFOA exposure from drinking contaminated Ohio River water.

195.    On November 23, 1982, defendant DuPont's then Medical Director, Bruce Karrh, MD, stated in an internal memorandum that "[t]here is obviously great potential for current or future exposure of members of the local community from emissions leaving the Plant perimeter."

196.    By 1984, defendant DuPont became aware that PFOA in particulate form exhausted from stacks at its Washington Works plant was carried by the wind well beyond the Washington Works plant property line and deposited in the soil throughout the community.  Defendant DuPont also learned that the drinking water supplies in communities around the Washington Works plant were contaminated with PFOA, presumably from air discharges from the plant of particulate matter that dissolved in rainwater and percolated into the groundwater and from direct discharges of liquids containing PFOA into the Ohio River.

197.    By 1984, defendant DuPont began a program of secretly collecting samples of tap water from public drinking water supplies near the Washington Works plant and testing these samples for PFOA.  DuPont found that PFOA was present in drinking water samples collected from locations in both Ohio and West Virginia in the vicinity of its Washington Works facility in both Ohio and West Virginia.

198.    By June of 1984, defendant DuPont was aware that water supplied by the town of Little Hocking, Ohio, which was located "up-river" from the Washington Works plant contained PFOA levels of at least 500 ppt.  Because of the location of the contaminated wells in Little Hocking in regards to the Washington Works facility and the direction of flow of the Ohio River, Defendant DuPont knew that this contamination was caused by PFOA released into the air from its manufacturing facility.  Although defendant DuPont knew that PFOA was persistent in the environment and that it was continuing to release PFOA into the air meaning that such releases

would likely increase the PFOA contamination in Little Hocking's drinking water, Defendant DuPont chose not to alert local, state or federal officials or the public.

199.    By 1985, defendant DuPont was aware that PFOA was leaching into groundwater beneath ponds that DuPont had previously used to dispose of PFOA contaminated sludge and was migrating through the groundwater under the plant into the public drinking water supply of Lubeck, WV, where DuPont found PFOA levels as high as 1,500 ppt. These PFOA levels increased to 1,900 ppt in 1987 and 2,200 ppt in 1988.

200.    By 1987, defendant DuPont had conducted air modeling at its Washington Works facility that documented PFOA in the ambient air beyond the fence line of the property and drifting with the wind into nearby communities.

201.    On June 11, 1987, defendant DuPont's Medical Director, Dr. Karrh, told DuPont officials that the Washington Works plant needed to give "highest priority" to issues associated with the presence of PFOA outside the boundaries of the plant.

202.    In January of 1992, defendant DuPont completed its purchase of the Lubeck wellfield it had previously found to be contaminated with PFOA. It then tested the new wells that were being used by the Lubeck community for drinking water and found that these wells had even higher levels of PFOA than the old wells, even though the new wells were two miles further away from the Washington Works plant. DuPont chose not to disclose its findings regarding the PFOA levels in the new Lubeck wells. The contamination of these wells was not made public until 2001 when the West Virginia Division of Environmental Protection tested the drinking water in Lubeck.

203.    In 1998, a 3M environmental specialist, Dr. Rich Purdy, prepared an ecological risk assessment which evaluated whether PFOS concentrations accumulating up the food chain were similar to concentrations that cause adverse effects, and in a report dated December 3, 1998

determined that ambient environmental levels of PFOS posed a substantial risk to marine mammals.

**C. The Manufacturing Defendants Suppressed Information about the Risks of PFAS, Deceived and Regulators, and Failed to Act on their Knowledge.**

204.    Despite decades of knowledge about the ubiquity and toxicity of PFAS, defendants 3M and DuPont actively sought to suppress scientific research on the hazards associated with these chemicals and mounted a campaign to control the scientific dialogue on the environmental and health risks of these chemicals.

205.    As the designers, manufacturers, users, marketers, distributors, and sellers of PFAS products, defendants 3M and DuPont had considerable influence over the information available to their customers, environmental regulators, and the general public. Defendants had a vested financial interest in exercising this influence to conceal the true harmful nature of PFAS, including PFOA and PFOS, in spite of their obligations to provide this information and to be truthful in advertising.

206.    In internal documents and testimony made public, defendants 3M and DuPont evidenced an intentional corporate strategy to "shape the debate at all levels." One consultant retained by DuPont to work on PFAS issues outlined the company's goal in a 2003 proposal to:

> [C]reate the climate and conditions that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. This would include facilitating the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm. We would also lay the foundation for creating *Daubert* precedent to discourage additional lawsuits . . . . This battle must be won in the minds of the regulators, judges, potential jurors, and the plaintiff's bar . . . . Manufacturers must be the aggressors.

207.    Defendants' efforts to suppress knowledge of the harms of PFAS began as soon as evidence of its toxicity began to emerge, when the Defendants marked scientific studies and related

documents as "confidential," withholding their disclosure in spite of the obvious public interest and evidencing an awareness of legal liability.

208.    As defendant 3M's Dr. Rich Purdy wrote:

> 3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process. This has stymied intellectual development on the issue, and stifled discussion on the serious ethical implications of decisions.

209.    Defendant 3M used a variety of tactics to deceive others and to hide the negative effects of PFAS. In Dr. Rich Purdy's letter of resignation from 3M, he detailed, among other things: 3M's tactics to prevent research into the adverse effects of its PFOS; 3M's submission of misinformation about its PFOS to EPA; 3M's failure to disclose substantial risks associated with its PFOS to EPA; 3M's failure to inform the public of the widespread dispersal of its PFOS in the environment and population; 3M's production of chemicals it knew posed an ecological risk and a danger to the food chain; and 3M's attempts to keep its workers from discussing the problems with the company's fluorochemical projects to prevent their discussions from being used in the legal process.

210.    Defendant 3M intentionally withheld scientific information about the material risks of its PFAS products. When researchers Guy and Taves contacted 3M in 1975 about the "universal presence" of organic fluorine in compounds in blood among the general population, 3M "plead ignorance," misled them by "advis[ing] him that 'Scotchgard' was a polymeric material not a [fluorochemical]," and took a position of "scientific curiosity and desire to assist in any way possible." 3M directed its Central Analytical Laboratory (CAL) to conduct similar sampling from blood banks, from which an internal report concluded that the organic fluorine compounds "resembled most closely" PFOS, confirming the suspicions held by the 3M researchers.

Subsequent 3M research in 1976 confirmed that the compounds found in human blood by Guy and Taves were PFOS manufactured by 3M.

211.    Guy and Taves proceeded to author a paper in 1979 speculating that the detected compounds were POAA (an ammonium salt of PFOA) and sent the paper to CAL for review. Despite its internal knowledge that the compounds were PFOS and its pledge to "assist in any way possible," defendant 3M withheld the identity of the compound at the urging of its lawyers. 3M facilitated the misdirection through two studies authored by the same CAL scientists who internally identified PFOS in the blood bank samples; one study published in 1979 "suggest[ed] the accuracy of Guy and Taves' conclusions about the identity of the [organic fluorine] found in blood," and a second in 1981 stated that the detected compounds were instead a naturally occurring substance.

212.    Defendant 3M withheld material scientific information from government agencies as well.  From the 1970s, 3M conducted over a thousand studies related to the properties of PFAS and its effects on human health and the environment. These studies should have been disclosed to the EPA, pursuant to TSCA Section 8(e), but from 1980 to 1993, 3M submitted only eighty-four studies or reports to the EPA. From 1998 to 2000, 3M submitted over 1,218 studies or reports, many of which had been prepared decades earlier.

213.    Even after 3M's phaseout, the company worked to control and to distort the science on PFAS. When 3M revealed in 1998 that PFOS was in the blood of the general population, it developed a "Science Publication Strategy" to simultaneously publish select studies in academic journals to create a "context which demonstrates that there is no medical or scientific basis to attribute any adverse health effects to 3M products." Meanwhile, Dr. John Butenhoff, 3M's Manager of Corporate Toxicology, had already calculated a "safe" level of PFOS in human blood

of 1.05 ppb and he reported internally that 3M needed to replace "PFOS-based chemistry as these compounds [are] **VERY** persistent and thus insidiously toxic."

214.    Defendant 3M's PFAS strategy included providing "[s]elective funding of outside research through 3M 'grant' money," including millions of dollars to a professor, John Giesy, who publicly presented himself as an independent expert but behind the scenes worked for 3M by reviewing articles submitted to academic journals for publishing. Dr. Giesy's goal, as expressed in a March 25, 2008, email, was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations they can be a large obstacle to refute." The deceptive intentions of 3M and Dr. Giesy were further evidenced by his assurances to his benefactor that he acted to ensure "there was no paper trail to 3M."

215.    Defendant 3M only shared its concerns with EPA beginning in May 1998, with the submission of a TSCA 8(e) letter for PFOS. However, that submission downplayed concerns about the environmental impacts of PFAS, as described by a 3M employee:

> Just before that submission we found PFOS in the blood of eaglets – eaglets still young enough that their only food consisted of fish caught in remote lakes by their parents. This finding indicates a widespread environmental contamination and food chain transfer and probably bioaccumulation and bio-magnification. This is a very significant finding that the 8e reporting rule was created to collect. 3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information.

216.    The same 3M employee, environmental specialist Dr. Rich Purdy, in his resignation letter in 1999 called PFOS "the most insidious pollutant since PCB [polychlorinated biphenyl]. It is probably more damaging than PCB because it does not degrade, whereas PCB does; it is mor toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB." Dr. Purdy sent his resignation letter to the EPA, effectively blowing the whistle on 3M's harmful and illegal activities.

217.    In 2000, under pressure from the EPA, defendant 3M announced that it would phase out production of PFOS, PFOA, and certain related products. The press release stated that "our products are safe" and cited the company's "principles of responsible environmental management" as the reason to cease production.

218.    The same day as 3M's announcement, the EPA issued a press release about 3M's phaseout stating "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

219.    In 2006, EPA cited 3M for 244 violations of the Toxic Substances Control Act related to PFOA and PFOS, accusing 3M of failing to notify the agency about new chemicals and of late reporting of "substantial risk information." Defendant 3M agreed to pay a fine of $1.5 million for these violations.

220.    Similarly, defendant DuPont conducted its own studies of the toxicity of PFOA but did not communicate the results to the public or to regulators. DuPont understood the nature of PFAS, the significance of its concentrations, and the hazards it presented to the company's employees, the public, and the environment.

221.    Despite its knowledge, Old DuPont continued to manufacture PFAS while it actively suppressed scientific awareness of the hazards of its products.

222.    By the late 1990s, Old DuPont understood its substantial liability exposure from its decades of releasing toxic PFAS into the environment. Internally, its employees expressed concerns that "toxicity issues associated with [PFOA] exposure could turn it into the #1 DuPont torte [sic] issue."

223.    These liability concerns extended to their interactions with regulators and their misleading disclosures. One of defendant DuPont's lawyers said in 2001:

> [O]ur analytical technique [for measuring PFOA in water] has very poor recovery, often 25%, so any results we get should be multiplied by a factor of 4 or 5. However, that has not been the practice, so we have been telling the agencies results that surely are low. Not a pretty situation, especially since we have been telling the drinking water folks not to worry, results have been under the level we deem "safe" of 1 ppb.
>
> [W]e are exceeding the levels we say we set as our own guideline, mostly because no one bothered to do the air modeling until now, and our water test has [been] completely inadequate . . . . I have been telling the business to get out all the bad news . . . . Too bad the business wants to hunker down as though everything will not come out in the litigation, god knows how they could be so clueless.

224.    In 2004, EPA filed an administrative enforcement action against defendant DuPont for its failure to disclose toxicity and exposure information for PFOA, in violation of TSCA and the Resource Conservation and Recovery Act ("RCRA"). DuPont agreed to pay over $16 million in civil administrative penalties and undertake supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

225.    At about the time this penalty was issued, defendant DuPont was making approximately $1 billion a year in revenue from products containing PFOA.

**D. Defendants' Use of PFAS in Hoosick Falls.**

226.    For several decades beginning as early as the late 1950s, PFAS were used in manufacturing processes at facilities in and around Hoosick Falls.

227.    One of these facilities is a factory located at 14 McCaffrey Street ("McCaffrey Street Site").

228.    New York State has identified the McCaffrey Street Site as a probable source for the presence of PFOA in the Village of Hoosick Falls' municipal water supply and local aquifer.

229.    Upon information and belief, testing of soil and groundwater at the McCaffery Street Site has indicated concentrations of PFAS, including PFOA and PFOS, in excess of state and federal regulatory limits.

230.    Indeed, the State has characterized the McCaffrey Street Site as a "significant threat to public health or the environment."

231.    The McCaffrey Street Site began operation in or about 1955.  A company called Dodge Industries, Inc. owned and operated the factory at that time.

232.    Upon information and belief, in or about 1967 Oak Electro/Netics Corp. purchased the assets and liabilities of Dodge Industries, including the McCaffrey Street Site and at approximately this time aqueous fluoropolymer dispersion ("AFD") fabric coating commenced at this site.

233.    Oak Electro/Netics Corp. ultimately changed its name to Oak Materials Group, Inc. and operated the McCaffrey Street site and other Hoosick Falls facilities until 1986.

234.    Upon information and belief, in or about 1986, Allied-Signal Inc. purchased Oak Materials Group, Inc., which included the assets and liabilities of the McCaffrey Street Site. Wholly-owned subsidiaries of Allied-Signal Inc, including AlliedSignal Laminate Systems Inc. operated the McCaffrey Street site until 1996.

235.    In addition, at or around the time that it purchased Oak Material Group, Allied-Signal merged Oak Materials Group with another acquisition, Norplex, to form Norplex-Oak.

236.    Shortly thereafter, the Norplex-Oak business unit took over operations of the Hoosick Falls facilities, which included the McCaffrey Street Site, as well as 1 Liberty Street, a facility at John St./Lyman St., and at least four buildings on River Road.

237.    The Hoosick Falls facilities were known within Allied-Signal as Fluorglas or the Fluorglas division.

238.    Fluorglas used PFAS in its operations at the facilities at McCaffrey Street, 1 Liberty Street, John Street, and in at least one of the buildings on River Road.

239.    Fluorglas purchased AFD that contained PFOA from DuPont and other manufacturers.

240.    Fluorglas also purchased PFOA from 3M.

241.    Upon information and belief, in or about 1996, Allied-Signal sold some of the assets and liabilities of its Hoosick Falls facilities, including the McCaffrey Street site, to Furon Company (Furon).

242.    Allied-Signal retained ownership of the facilities at John Street and River Road, both of which used PFOA in manufacturing processes both during and prior to Allied-Signal's ownership of those facilities.

243.    In or about 1999, Saint-Gobain merged with Furon. The surviving entity, called Furon, then changed its name to Saint-Gobain Performance Plastics Corp. and continued operating the McCaffrey Street site and the site at 1 Liberty Street.

244.    Saint-Gobain has continuously owned and operated the McCaffrey Street site from the time it merged with the Furon Company to the present.

245.    Throughout the operation of the McCaffrey Street site, Saint-Gobain and Honeywell (through its predecessors) manufactured stain- and water-resistant fabric coated with

42

AFD at the factory.

246.    In manufacturing stain-resistant fabric, each company coated the fabric with an AFD manufactured by defendant DuPont that contained APFO.

247.    Saint-Gobain, Furon, Allied-Signal, and Oak Materials utilized trays for the application of the AFD to the fabric. Employees added the dispersion to the trays during production runs and recovered a portion of the dispersion at the end of the run each shift.

248.    During the drying process, heat would vaporize a portion of the PFOA, which was discharged from the facility as fine particulate matter that was then transported by wind where it settled to the ground and contaminated the soil throughout to the community. Ultimately, PFOA traveled through the soil to the groundwater.

249.    On average, the McCaffrey Street Site ran three shifts, five days a week.

250.    Saint-Gobain also utilized PFAS in other processes at the McCaffrey Street Site between 1999 and approximately 2004. Among other things, Saint-Gobain produced PTFE (polytetrafluoroethylene) film and silicone rubber for aeronautical, automotive, food processing and energy applications.

251.    Saint-Gobain discontinued its fabric coating operations at the McCaffrey Street site in May of 2003, and thereafter created its rubber department in the same location at the plant.

252.    Oak Materials, Allied-Signal, Furon and Saint-Gobain utilized from 4 to 8 large, approximately three-story ovens or towers with 3 zones as a part of their AFD coating processes. The majority of these towers used IR radiation to heat the AFD and vented the exhaust out of each zone so that the vapors released never reached a high enough temperature to destroy PFOA.

253.    The AFD coating process in the ovens produced a sticky residue that would adhere to the internal tubing or "stacks" within the oven, and PFOA comprised a part of that residue.

254. Each company established a rotation by which each oven and its stacks were cleaned once every six weeks, with a different oven cleaned every Monday.

255. Company employees removed the residue in the stacks by washing the stacks in a large sink that measured approximately 3 feet by 3 feet by 20 feet in size. At the end of each cleaning, the wastewater from the cleaning was discharged down a drain.

256. The residue containing PFOA that accumulated on the ductwork was also burned outside the McCaffrey Street site during the 1970s and 80s.

257. Liquid waste from the McCaffrey Street Site was collected in an unlined concrete sump in the basement of the facility and then pumped into the sanitary sewer system of the Village of Hoosick Falls where it was transported to the Hoosick Falls Waste Treatment Facility (HFWTF). This facility had no capacity to remove PFAS from the waste stream. PFAS from the McCaffrey Street Site either accumulated in the sewage sludge or was discharged to the Hoosic River. Sludge from the HFWTF containing PFAS was deposited at the Hoosick Falls Landfill. The cement sump at the McCaffrey Street site was unlined and allowed PFAS to leach directly into the groundwater. This sump had an overflow pipe that was later found to be broken, allowing PFAS in the water that entered the overflow pipe to leach into the groundwater as well.

258. In addition to the McCaffrey Street Site, New York State has identified the facilities at Liberty Street, John Street, and River Road as potential sources of PFOA contamination.

259. NYSDEC added the Liberty Site to the NYS Registry of Hazardous Waste Disposal Sites as a Class 2 site. PFOA was "detected in on-site groundwater and surface water at concentrations which exceed applicable standards, criteria, and guidance. PFOA is migrating from the facility in groundwater and surface water. NYSDOH has determined that contaminants on-site,

and migrating from the site, represent a significant threat to public health. The available data confirms disposal of PFOA at the site."[16]

260.    The River Road site is classified as a "p-site" requiring further investigation.

261.    The River Road site is located approximately 500 feet north of Plaintiffs' Property.

262.    Upon information and belief, at all relevant times, PFAS waste materials originating from the McCaffrey Street site were dumped on the River Road site.

263.    Upon information and belief, limited testing of soil and groundwater at the Liberty Street Site has indicated concentrations of PFAS, including PFOA and PFOS, in excess of state and federal regulatory limits.[17]

### E. Contamination of Plaintiffs' Property, Soils, Groundwater, Aquifers, and Tree Nursery.

264.    Defendants' PFAS products have contaminated plaintiffs' Property, including the soils, groundwater, aquifers, and nursery trees located on the Property.

265.    As discussed above, plaintiffs Elhannon Wholesale Nursery, Inc. and James. D. Sutton own and operate approximately 100 acres of property as a tree nursery located on State Route 22 along the Hoosic River in the Town of Hoosick (Tax Map No. 37.-2-37.12) (the "Property"), that is south of the Saint-Gobain McCaffrey Street site.

266.    The Property is depicted in Figure 1 below, identified as the "Elhannon Nursery":

---

[16]  NYSDEC Public Notice State Superfund Program (July 2017), available at: https://extapps.dec.ny.gov/data/der/factsheet/442048class2.pdf.

[17]  See e.g., C.T. Male and BEC Engineering and Geology, P.C. (August 2022), Remedial Investigation/Feasibility Study Work Plan – OU-01 Addendum, McCaffrey Street Site, available at: https://extapps.dec.ny.gov/docs/remediation_hudson_pdf/442046fsriwpou1add.pdf.



Figure 1 – Google Map

267.    Plaintiffs' Property is not serviced by a municipal drinking water system.

268.    To use or develop a source of drinking water supply on the Property would require the use or development of groundwater wells.

269.    As part of the nursery operations, plaintiffs grow, cultivate and sell trees and nursery stock.

270.    This includes the removal of trees and their root balls, which contain soil and groundwater.

271.    The groundwater on plaintiffs' Property flows through the soils, including through the soils upon which the nursery trees are planted.

272.    The removal and transplant of nursery trees requires that the root ball containing soil and groundwater be extracted from the ground and transplanted.

273.    For example, the root ball of a 10-inch caliper nursery tree can be over 110 inches in diameter, over 48 inches in depth, and weigh over 8 tons (16,000 pounds), including the weight of soil and water within the root ball.  The root ball of 14-inch caliper nursery tree can be over 130 inches in diameter, over 56 inches in depth, and weigh over 12 tons (24,000 pounds), including the weight of soil and water within the root ball. These root ball sizes are the equivalent of a dump truck of soil.

274.    Upon information and belief, the soil and groundwater in which the nursery trees are planted is contaminated with PFAS, including the tree root balls that must be transplanted upon sale.

275.    Plaintiffs' Property currently contains over 55,000 nursery trees that were planted for commercial use and sale.

276.    The sale value of nursery trees varies based on species, caliper and height, ranging for example from $150 for a one-year liner to $15,000 for a 14-inch caliper hardwood.

277.    Plaintiffs' customers include landscape architects, contractors, organizations and others who will not accept trees for transplant which contain hazardous environmental contaminants, including tree root balls containing soil and water contaminated by PFAS.

278.    Upon information and belief, state regulatory authorities will not permit the removal, transplant or other release of contaminated soil and water into the environment, including the removal and transplant of soil and water contaminated by PFAS.

279.    In April 2024, certain groundwater samples were collected from plaintiffs' Property.

280.    The groundwater samples were taken from six monitoring wells installed by Alpha Geoscience, a geological, hydrological and environmental consulting firm.

281.    The groundwater monitoring wells were installed to assess the conditions at Plaintiffs' property prior to activation of the Village's new wellfield.

282.    The monitoring wells consisted of three shallow wells and three deep wells located in the north, south and west portions of the Property.

283.    By letter dated May 21, 2024, Alpha Geoscience advised plaintiffs Elhannon Wholesale Nurseries, Inc. and James D. Sutton, of the groundwater sampling test results.

284.    The groundwater samples were analyzed for PFAS by EPA Method 1663.

285.    PFAS were both detected at concentrations exceeding regulatory limits.

286.    PFOA was detected at concentrations of 86.6 nanograms per liter (ng/L) to 245 ng/L in all three shallow monitoring wells.

287.    PFOA was detected at concentration of 115 ng/L in the north deep monitoring well.

288.    PFOS was detected at concentrations of 5.14 ng/L to 22.4 ng/L in the south and north shallow monitoring wells.

289.    In March 2025, plaintiffs collected samples of tree cores and tree roots taken from three (3) trees on the Property, which were located, respectively, on the north, south and west portions of the Property.

290.    The tree core and tree root samples were analyzed for PFAS pursuant to EPA Method 1663.

291.    By letter dated March 26, 2025, Pace Analytical Services, LLC advised plaintiffs of the tree sampling test results.

292.    PFOS was detected in one root sample taken from the north portion of the Property at a concentration of .96 parts per billion (ug/kg).

293.    Upon information and belief, the soil and groundwater on plaintiffs' Property are contaminated with PFAS in exceedance of regulatory limits.

294.    Upon information and belief, the soil and groundwater within the root balls of the nursery trees on the Property are contaminated by PFAS.

295.    Upon information and belief, PFAS remain present on plaintiffs' Property, including in the soil, groundwater, aquifers and nursery trees on the Property.

296.    The NYSDEC groundwater standard for PFOA and PFOS is 6.7 ng/L and 2.7 ng/L, respectively.

297.    The NYSDOH drinking water standard for PFOA and PFOS is 10 ng/L.

298.    The USEPA drinking water standard for PFOA and PFOS is 4 ng/L.

299.    The NYSDEC standard for PFOA and PFOS in unrestricted soil (including agricultural soil) is .66 parts ug/kg and .88 parts ug/kg, respectively.

300.    Upon information and belief, the source of the PFAS contamination on plaintiffs' Property is the result of the acts and omissions of defendants, including defendants' design, manufacturing, use, marketing, distribution, and/or use of PFAS and/or polytetrafluoroethylene (PTFE) dispersions containing PFAS as described in this complaint.

301.    As a direct and proximate result of defendants' acts and omissions, plaintiffs' Property has been adversely impacted by PFAS and is at risk of continuing and future harm.

302.    As a direct and proximate result of defendants' acts and omissions, the source of drinking water supply on plaintiffs' Property is contaminated and not fit for human use and consumption.

303.    As a direct and proximate result of defendants' acts and omissions, the soil and groundwater on plaintiffs Property is contaminated and not fit for agricultural use, including use as a tree nursery

304.    As a direct and proximate result of defendants' acts and omissions, the nursery trees, including the tree root balls, on Plaintiffs' property are contaminated and not fit for use and sale.

305.    As a direct and proximate result of defendants' acts and omissions, plaintiffs have suffered and will continue to suffer economic loss and diminution in the value of plaintiffs' real and personal property.

306.    As a direct and proximate result of defendants' acts and omissions, plaintiffs have suffered and will continue to suffer economic loss and diminution in the value the nursery trees on the Property, including but not limited to loss associated with the improvement, planting, cultivation, and ability to market and sell said nursery trees.

307.    As a direct and proximate result of defendants' acts and omissions, plaintiffs have suffered and will continue to suffer economic loss, damages and stigma associated with Plaintiffs' Property, business, and reputation.

308.    Plaintiffs are entitled to recover damages and other relief, including cleanup and removal costs, direct and indirect damages, and other economic losses which have been incurred and will be incurred by plaintiffs, including but not limited to loss of use and enjoyment of the Property; diminution in value of the property and tree nursery thereon; investigation, monitoring, testing, and remediation costs; costs associated with obtaining alternative water supplies; loss of revenue and other damages resulting from contamination of the nursery trees and other nursery stock; stigma and reputational damages to plaintiffs' Property and business; loss related to the capital investment and improvement of plaintiff's property and nursery; damages associated with regulatory compliance, potential civil penalties, and other costs of regulatory enforcement; and other associated damages and loss.

309.    The Claims herein are brough under New York law.

## CAUSE OF ACTION

### CLAIM I

### STRICT LIABILITY PRODUCT LIABILITY FOR FAILURE TO WARN AGAINST DEFENDANTS DUPONT AND 3M

310.    Plaintiffs repeat and reallege each paragraph above as if set forth fully herein.

311.    At all times relevant, defendant 3M designed, manufactured, used, marketed, distributed and/or sold PFAS products to defendants Saint-Gobain and Honeywell that was used at these defendants' facilities in their manufacturing processes as described herein.

312.    At all relevant times, from the 1950's through approximately 2000, defendant 3M designed, manufactured, marketed, used, distributed and/or sold PFAS to DuPont and other

manufacturers for inclusion in polytetrafluoroethylene (PTFE) and fluorinated ethylene propylene (FEP) dispersion products, and sold such products to defendants Saint-Gobain and Honeywell in the ordinary course of their business.

313.    At all relevant times, from the 1950s through approximately 2015, defendant DuPont designed, manufactured, used, marketed, distributed and/or sold fluoropolymer materials containing PFAS for inclusion in PTFE dispersion products, and sold such products to defendants Saint-Gobain and Honeywell in the ordinary course of their business.

314.    At all relevant times, from approximately 2000 through 2015, defendant DuPont designed, manufactured, used, marketed, distributed and/or sold fluoropolymer materials containing PFAS, including for inclusion in PTFE dispersions, and sold such products to other manufacturers of PTFE dispersions, and to defendant Saint-Gobain in the ordinary course of its business.

315.    By at least 1984, defendants DuPont and 3M were aware of the environmental and health hazards associated with PFAS exposure as well as the potential for PFAS to contaminate soil and groundwater.

316.    Both defendants were also aware that there were technologies that could reduce or eliminate the PFAS emissions for PTFE coating manufacturing facilities and/or that PFAS could be replaced in PTFE dispersions with another surfactant.

317.    Defendants 3M and Dupont both chose to continue to sell PFAS products, including PFAS-containing PTFE dispersions, and not to advise purchasers of the true hazards of PFAS, or instruct them about and recommend emission reducing technologies because of concerns for loss of profits to these defendants.

318. Upon information and belief, defendants Honeywell and Saint-Gobain utilized PFAS-containing PTFE dispersion products supplied by defendants DuPont and 3M in a reasonably foreseeable and intended manner and for such products' intended uses.

319. The PFAS products sold by defendants DuPont and 3M to defendants Honeywell and Saint-Gobain were unreasonably dangerous to human health and the environment without adequate warnings and instructions to prevent discharge of PFAS into the environment, including plaintiffs' Property, and contamination of the soil, groundwater and aquifers, and toxic bioaccumulation.

320. Defendants DuPont and 3M knew or should have known that the PFAS products that they sold to defendants Honeywell and Saint-Gobain would be discharged into the environment and cause contamination of soils, groundwater and aquifers where their products were used, including plaintiffs' Property.

321. Defendants DuPont and 3M had actual knowledge of the environmental and health hazards associated with PFAS exposure through both environmental and animal studies conducted by researchers employed or contracted by such defendants and through experience with each defendant's own facilities and workers, but, upon information and belief, failed to disclose and communicate such information to relevant governmental agencies, or to foreseeable users of the materials, including employees handling and disposing of them at the Hoosick Falls facilities.

322. Defendants DuPont and 3M also failed to warn and alert purchasers and users or the public of their discoveries of extensive soil and groundwater contamination in communities located near their Washington Works (DuPont) and Cottage Grove (3M) facilities once these water supplies were determined to be contaminated with PFAS, including PFOA, PFOS, or other similar fluorochemicals produced by defendant 3M.

323.    Defendants DuPont and 3M failed provide adequate instructions and warnings when their fluorochemicals and fluorochemical-containing products were sold and accordingly sold products that were unreasonably dangerous for their intended use and defective, making them strictly liable for the injuries and damages sustained by plaintiffs.

324.    Defendants DuPont and 3M breached their continuing duty to warn of defects in their products after learning of the extensive environmental contamination caused by PFAS in or near their own facilities and failing to pass this information on to purchasers, users and others in the communities where these products were utilized who could be adversely affected.

325.    Had defendants DuPont and 3M provided adequate warnings and instructions of the known health hazards and risk of environmental contamination of PFAS and their PFAS-containing products to purchasers, users, governmental agencies and the public, it is more likely than not that plaintiffs' injuries and damages would not have occurred or would have been lessened as actions would have been taken to reduce or eliminate PFAS and contamination of the environment in and around Hoosick Falls with PFAS.

326.    Defendants 3M and DuPont acted with deliberate and/or reckless indifference to the health and environmental hazards of their PFAS products, including to the residents, businesses, and properties in the communities where their PFAS products were used, including plaintiffs, by failing to provide adequate warnings of the known dangers of PFAS when discharged into the environment, including the air, soils, groundwater and aquifers.

327.    As a direct and proximate result of the sale of their defective PFAS products lacking proper warnings and instructions, plaintiffs have suffered contamination of their Property, including the soil, groundwater, aquifers and nursery trees located thereon, and other damages, both economic and non-economic.

328.    As a direct and proximate result of the acts and omissions of defendants, plaintiffs have incurred substantial damages and loss and anticipate incurring additional damages and loss.

329.    Defendants are liable to plaintiffs for all damages, punitive damages, costs, remedial measures, alternative water supplies, and other losses, resulting directly and indirectly from the conduct complained of herein.

## CLAIM II

### NEGLIGENCE (GROSS NEGLIGENCE)
### AGAINST ALL DEFENDANTS

330.    Plaintiffs repeat and reallege each paragraph above as if set forth fully herein.

331.    Defendants 3M and DuPont knew or should have known that PFAS and PTFE dispersions containing PFAS that were used in the manufacturing processes at defendants Honeywell's and Saint-Gobain's facilities would result in the release of PFAS into the environment, including contamination of the soils and groundwater on plaintiffs' Property.

332.    All defendants knew or should have known that use of PFAS, PFAS-containing PTFE dispersions and/or the discharge of PFAS into the air, ground and sewer system was potentially hazardous to human health and the environment, and required defendants to take adequate safety precautions to ensure that PFAS was not released into the surrounding environment.

333.    All defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to wash out and/or discharge filters or trays containing PFAS-containing PTFE dispersions onto the ground within floor drains in, and in close proximity to, the McCaffrey Street, Liberty Street and other facilities operated by defendants Saint-Gobain and Honeywell in Hoosick Falls.

334.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to wash out and/or discharge into the environment the residue from the manufacturing ovens and their stacks where PFAS-containing PTFE dispersions were used.

335.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to permit PFAS vapors and particulate matter to exit from stacks at the facility without adequate control measures.

336.    During some of the years of the operation of PTFE coating manufacturing facilities in Hoosick Falls defendants 3M and DuPont failed to share information and knowledge that these companies had and to provide adequate warnings and instructions to defendants Honeywell and Saint-Gobain about the hazards of PFAS to the environment and to the safety of the community.

337.    At some point in time after use of PFAS at the Hoosick Falls facilities began, either based upon information provided by defendants 3M and/or DuPont, or through published and available literature, defendants Saint-Gobain and Honeywell, knew or should have known of the environmental risks and health hazards associated with PFAS.

338.    Defendants 3M and DuPont had a continuing duty to warn purchasers of their PFAS and PFAS-containing products of risks and hazards learned by such defendants after sale of these products.

339.    Defendants Saint-Gobain and Honeywell had a duty to take all reasonable measures to ensure that PFAS-containing PTFE dispersions and/or PFAS would be effectively contained and not discharged into the surrounding environment.

340.    Defendants Saint-Gobain and Honeywell further had a duty to ensure that the manufacturing processes they chose to employ did not unreasonably endanger environmental and human health, including the air, soil and groundwater in Hoosick Falls and the surrounding area.

341.    Defendants Saint-Gobain and Honeywell breached the above-stated duties by unreasonably disposing of and/or releasing PFAS into environment, including in such manner that defendant knew and/or it was reasonably foreseeable that PFAS would enter and disperse through the environment, including through air, soil and groundwater.

342.    Defendants 3M and DuPont had a duty to warn users of their PFAS products of the dangers of releasing PFAS into the environment and breached that duty by failing to disclose information they possessed about the health hazards associated with PFAS exposure, the propensity of PFAS to cause environmental contamination of soil, groundwater, drinking water supplies, and the bioaccumulation of PFAS in humans and biota.

343.    Defendants 3M and DuPont further breached their continuing duties to warn about the dangers of PFAS learned after the manufacture and sale of their PFAS and PFAS-containing products to defendants Saint-Gobain and Honeywell.

344.    Defendants 3M and DuPont breached the above-stated duties by failing to adequately warn and provide sufficient instructions to foreseeable users of the products including employees handling and disposing of the products at the Hoosick Falls facilities, and to avoid discharging PFAS into the environment where it was likely to enter the soil and ground water, including plaintiffs' Property.

345.    Had defendants DuPont and 3M provided adequate warnings and instructions of the known health hazards and risk of environmental contamination of PFAS and their PFAS-containing products to purchasers, users, governmental agencies and the public, it is more likely than not that plaintiffs' injuries and damages would not have occurred or would have been lessened as actions would have been taken to reduce or eliminate PFAS and contamination of the environment in and around Hoosick Falls with PFAS.

346.    As a result of defendants' breaches of the various duties set forth above, the soil, groundwater and drinking water supplies in and around Hoosick Falls, New York became contaminated with unsafe levels of PFAS, including plaintiffs' Property.

347.    Upon information and belief, defendants 3M and DuPont were grossly negligent, acted with deliberate and/or reckless indifference to the health and safety of the public and environment, and/or intentionally failed to make public or provide to purchasers of their products information that said defendants possessed about the potential danger and harm resulting from the use and discharge of PFAS products into the environment.

348.    Upon information and belief, defendants Saint-Gobain and Honeywell were grossly negligent, acted with reckless indifference to the health and safety of the public, intentionally failed to prevent PFAS from being discharged into the environment, and/or intentionally failed to disclose to the public, including plaintiffs, of the potential that PFAS was contaminating the environment, including the soils and groundwater.

349.    The foregoing conduct of defendants constitutes intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of the period of time over which the conduct continued, the long-held knowledge of the defendants, the repeated failure to disclose and warn against same, and/or the repeated efforts to minimize the seriousness and scope of the problem.

350.    As a direct and proximate result of the defendants' acts and omissions described herein, plaintiffs have suffered injury, and such injury was foreseeable.

351.    As a direct and proximate result of defendants' actions and omissions described herein, plaintiffs have suffered contamination of their Property, including the soil, groundwater, aquifers and nursery trees located thereon, and other damages, both economic and non-economic.

352.    As a direct and proximate result of the acts and omissions of defendants, plaintiffs have incurred substantial damages and loss and anticipate incurring additional damages and loss.

353.    Defendants are liable to plaintiffs for all damages, punitive damages, costs, remedial measures, alternative water supplies, and other losses, resulting directly and indirectly from the conduct complained of herein.

## CLAIM III

### PRIVATE NUISANCE
### AGAINST DEFENDANTS SAINT-GOBAIN AND HONEYWELL

354.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

355.    Defendants Saint-Gobain and Honeywell, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated plaintiffs' Property, including the soils, groundwater, aquifers, and nursery trees located on the Property.

356.    Defendants' acts and omissions resulting in the contamination of plaintiffs' Property have substantially interfered with plaintiffs' rights to use and enjoyment of their property, including plaintiffs' ability to avail themselves of the soils and groundwater for agricultural and other purposes, to use the aquifers as a drinking water supply, and to realize the value of the property, improvements, and nursey trees planted and cultivated thereon.

357.    Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute a continuous invasion of the property rights of plaintiffs.

358.    Defendant is liable to plaintiff under the common law of private nuisance and pursuant to the New York Real Property Law and Proceedings § 841 for the creation and maintenance of a private nuisance.

359.    As a direct and proximate result of the acts and omissions of defendants, plaintiffs have incurred substantial damages and loss and anticipate incurring additional damages and loss.

360.    Defendants are liable to plaintiffs for all damages, punitive damages, costs, remedial measures, alternative water supplies, and other losses, resulting directly and indirectly from the conduct complained of herein, including injunctive relief to abate such nuisance and/or for all costs incurred by plaintiffs in investigating, monitoring, testing, and abating the same.

## CLAIM IV

### TRESPASS
### AGAINST DEFENDANTS SAINT-GOBAIN AND HONEYWELL

361.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

362.    Plaintiffs are the owner and/or lessee of the Property with rights of use and possession.

363.    Defendants Saint-Gobain and Honeywell negligently, recklessly, and/or intentionally failed to properly control, apply, use and/or dispose of PFAS and/or products containing PFAS such that defendants proximately caused PFAS contaminants to enter, invade, intrude upon and injure the rights of plaintiffs to possess and use their property.

364.    Plaintiffs have not consented, and do not consent, to the contamination alleged herein.

365.    Defendants Saint-Gobain and Honeywell knew or reasonably should have known that plaintiffs would not consent to this trespass.

366.    As a direct and proximate result of defendants Saint-Gobain's and Honeywell's acts and omissions as alleged herein, plaintiffs have suffered contamination of their Property, including

the soil, groundwater, aquifers and nursery trees located thereon, and other damages, both economic and non-economic.

367.    As a direct and proximate result of the acts and omissions of defendants, plaintiffs have incurred substantial damages and loss and anticipate incurring additional damages and loss.

368.    Defendants are liable to plaintiffs for all damages, punitive damages, costs, remedial measures, alternative water supplies, and other losses, resulting directly and indirectly from the conduct complained of herein.

## CLAIM V

### STRICT LIABILITY FOR ABNORMALLY DANGEROUS ACTIVITY AGAINST  DEFENDANTS SAINT-GOBAIN AND HONEYWELL

369.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

370.    Defendant Saint-Gobain's and Honeywell's acts and omissions, including their manufacturing, use and disposal practices resulting in PFAS contamination of plaintiffs' Property as described herein, constitutes an abnormally dangerous, ultrahazardous and/or inherently or intrinsically dangerous condition for which defendants are strictly liable to plaintiffs under common law.

371.    Defendants Saint-Gobain and Honeywell intentionally and/or recklessly disregarded and failed to disclose the adverse environmental and health risks, hazards and consequences related to their use and disposal of PFAS.

372.    As a direct and proximate result of defendants' conduct, the State of New York has designated the Saint-Gobain facility located at 14 McCaffrey Street as a Superfund site that constitutes a "significant threat to public health or the environment," has designated the Liberty Street site as a "p-site", and is actively investigating the River Road site.

373.    As a direct and proximate result of defendants Saint-Gobain's and Honeywell's acts and omissions as alleged herein, plaintiffs have suffered contamination of their Property, including the soil, groundwater, aquifers and nursery trees located thereon, and other damages, both economic and non-economic.

374.    As a direct and proximate result of the acts and omissions of defendants, plaintiffs have incurred substantial damages and loss and anticipate incurring additional damages and loss.

375.    Defendants are liable to plaintiffs for all damages, punitive damages, costs, remedial measures, alternative water supplies, and other losses, resulting directly and indirectly from the conduct complained of herein.

## CLAIM VI

## DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
## AGAINST ALL DEFENDANTS

376.    Plaintiffs repeat and reallege each paragraph above as if set forth fully herein.

377.    An actual controversy exists between plaintiff and defendants concerning the parties' respective obligations and potential legal liabilities in connection with the PFAS contamination of plaintiffs' real property, groundwater, aquifers, and tree nursery, which constitutes an actual, imminent, and substantial endangerment to plaintiffs' property, health, and other rights and shall result in cleanup and removal costs, direct and indirect damages, and other economic losses which have been incurred and will be incurred by plaintiffs, including but not limited to loss of use and enjoyment of the property; diminution in value of the property and tree nursery thereon; investigation, monitoring, testing, cleanup and remediation costs; costs associated with obtaining alternative water supplies; loss of revenue and other damages resulting from contamination of the nursery trees and other nursery stock; stigma and reputational damage to plaintiffs' Property and business; loss related to the capital investment and improvement of

plaintiff's property and nursery; together with damages associated with regulatory compliance, potential civil penalties, and other costs of regulatory enforcement.

378.    Absent judicial declaration settling the parties' rights and obligations of the aforesaid claims, a multiplicity of suits may result.

379.    Accordingly, plaintiff seeks a declaration that defendant is liable and subject to the relief demanded herein and judgment granting injunctive relief to compel defendant to protect and clean up plaintiff's property and public water supply, and to provide plaintiff with an alternative water supply.

380.    Absent injunctive relief, plaintiff has no adequate remedy at law to protect and enforce its rights, to protect the public health and welfare from an imminent and substantial endangerment of plaintiff's property and public drinking water supply, and shall suffer irreparable injury thereby.

381.    Based upon all of the foregoing, the equities balance in plaintiff's favor.

## JURY TRIAL DEMAND

382.    Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment and relief against defendants as follows:

1.    Declaratory and injunctive relief adjudicating the legal rights and obligations of the parties, including compelling defendant to investigate, test, monitor, clean up and remove the contamination present within plaintiffs' property, groundwater, aquifers and tree nursery, and to provide plaintiffs with alternative water supplies;

2.    Compensatory damages in an amount to be determined upon trial;

3.    Punitive damages in an amount to be determined upon trial;

4.      Attorneys' fees, disbursements and costs;

5.      Pre-judgment and post-judgment interest in the maximum amount allowed by law; and

6.      Such other and further relief as the Court deems just and proper.

Dated: April 28, 2025

*/s/ Donald W. Boyajian*
*/s/ James R. Peluso*

_____
Donald W. Boyajian (Bar Roll # 101196)
James R. Peluso (Bar Roll # 105634)
DREYER BOYAJIAN LLP
75 Columbia Street
Albany, New York 12210
Telephone: (518) 463-7784
dboyajian@dblawny.com
jpeluso@dblawny.com

*Attorneys for Plaintiffs Elhannon Wholesale Nursery, Inc., and Donald J. Sutton*